This is our case number 423-0491, Illinois Commerce Comm'n, if I'm sure I have it right in the correct folder. Comm'n Rahoul Petitioner v. Illinois Commerce Comm'n. The appellate, introduce yourself please. My name is Anup Appley. Very good. And for the appellee, who will be arguing? Good morning, your honor. My name is Robert Weinstock. I represent the Environmental Defense Concierge Club of the Respiratory Health Association. I'll be taking the first part of our argument, and I'll let my co-counsel, who will be taking the second and third parts, introduce themselves. And you're dividing, you know how to divide that time. Yes, I'll be taking seven minutes. Very good, very good. You may proceed. Christine Burrock on behalf of the American Illinois Company. Thank you. Thank you, your honors, and may it please the court. Assistant Attorney General Ben Jacobson on behalf of the people. The commission's misguided interpretation of Section 45G of the Electric Vehicle Act is erroneous as a matter of law for three interrelated reasons. The first of these reasons, interpreting both parts of the retail rate cap in Section 45G, is related to the Second District's decision in the ComEd case, as discussed in our reply brief. The second of these two reasons, the charger installation rebates and the discretion granted to Ameren in the compliance BEP plan are unique to this appeal. Combined, these errors allowed Ameren improper discretion to set spending levels and then determine how to allocate that money across its plan, leading, unsurprisingly, to the utility spending significantly more than the legislature intended. As the commission removed the statutory constraints on plan spending, we see Ameren's spending go up and up and up with the rate payers left footing the bill. Looking to the plain language of the statute, the necessary conclusion is that the commission and the Second District got it wrong on all three of these issues. The retail rate cap applies to the entirety of the BE plan. In this specific context, total annual revenue requirements means Ameren's delivery services revenue requirements. The specific rebates that Ameren seeks to include in its plan are delegated exclusively to the Illinois EPA. And the commission cannot allow a utility discretion to double its spending as it sees fit in its compliance plan. I'd like to start with the retail rate cap in Section 45G and the Second District's decision, which is non-binding persuasive authority. This court should decline to follow the Second District because simply it got it wrong, something that Ameren and the commission staff agreed with through much of the proceedings below before the commission. Before the commission, Ameren and staff agreed that construing development of EV infrastructure as only direct spending on that infrastructure deprives development of substantive meaning and renders the retail rate cap effectively toothless. They agreed that the commission's interpretation arbitrarily restricts direct spending on EV infrastructure while failing to limit spending on the development of that infrastructure, defeating the legislature's express purpose in Section 45A along with the purposes of increasing use of EVs and building up the infrastructure to support that, that third pillar purpose of limiting the impact of this development on rate payers. And they agreed that, and they continued to agree even after the interim order in the ComEd case came down, which established the commission's position that it was only restricted to direct spending on EV infrastructure. And we can see why they took this position with how the spending increased across Ameren's plans throughout the proceedings before the commission. In the original proposed BE plan, it was only spending for $9.6 million. In the immediately following revised plans, it was up to $11 million. But then once the definitions in 45G started coming into play and the total annual revenue requirements, which is intimately tied with this, was expanded to include all of Ameren's rates and charges, that spending more than doubled to $27 million. And then between that final proposed plan and the compliance plan, with the addition of the definition that we have here where the cap only applies to the direct spending, it more than doubled again from $27 million to $64.5 million. And in that final compliance plan, the cap for 2023 only applied to 0.7 percent of Ameren's spending for that year. Then for 2025, the overall spending for that year was up to $36 million, which was more than the 1 percent cap set even by the commission itself. This is an absurd result that demonstrates how the commission's interpretation which the second district upheld eliminates that third core pillar of the legislature's purpose with these beneficial electrification plans of limiting the impact on rate payers from this admittedly, under the statutory language, desired spending on the EV infrastructure and the development of that infrastructure. Properly construed development necessarily includes the process of advancing and growing that infrastructure. And we see that in the statute with the necessary programs in 45B and the elements and factors in 45D. And all of these pieces develop the EV infrastructure. I think a really illustrative example of what we think should be included and which under the commissions in the second district's construction is excluded are the pilot programs, which were ordered to be included here. There were three pilot programs, all of which contribute to the creation and growth of EV infrastructure because they collect the data that's necessary to know where more infrastructure is going to be needed and where it does not need to be built up. But under the commission's construction, which the second district upheld, that's not development of EV infrastructure, so that's not subject to the cap. In addition, customer education programs. These are to create awareness for rate payers so that they know about the pilot programs and so that they know about all of the incentives that are available so that the Ameren can collect the data and distribute the incentives, which contribute towards the development of EV infrastructure over time. But under the commission and the second district's construction, that is not development. So you want us to totally ignore the second district case? Not ignore, Your Honor. I mean, I think that it's a reasoned explanation for why the second district got it wrong. You know, if we look at the effects of this construction and the fact that it doesn't take into account Section 45 as a whole, you can see that it's arbitrarily restricting some spending within the plans and not the other spending within the plans, even though all of it contributes towards the development of EV infrastructure. You know, under that interpretation, there really is no purpose of the word development because all it applies to is EV infrastructure. So there's no point for the legislature to have included that word, but we can't deprive a word of meaning. And then, you know, this also ties into the second element within Section 45G, the total annual revenue requirements, which that establishes the pool of money for setting the cap. You know, a revenue requirement, it's a term of art, but all it means is the total amount of money that Ameren or any other utility can charge in rates for a given year. And the commission precedent and the court's precedent has been very clear that revenue requirements only applies to the general rate plan, the kind of overall yearly rate plan that the utility establishes. These other rates and charges, these riders, they cannot affect the rate plan or the revenue requirements. They're categorically distinct because if you can't affect something, then it has to be something different. But under the commission and the second district's construction, they've broken down that categorical distinction and lumped everything together, which makes the pool of money that you apply the 1% rate cap to much, much higher. For instance, here, it more than doubles it from about 10.4 to, I believe, it's about 23 million. And, again, this goes contrary to the purpose of having this restriction, this 1% cap, because it increases that impact on the rate payer beyond what the legislature intended. So, you know, the second district in particular and the commission, they focused on the words total and the fact that revenue requirements was plural. But that is encompassed under our interpretation because with a multi-year rate plan, which was introduced in the same legislation that created these beneficial electrification plans, every individual year has its own annual revenue requirement. And then every annual revenue requirement will have a reconciliation revenue requirement where you come back and make sure that the spending was accurate. So total covers all of these revenue requirements. And then it's plural because there's multiple years in there. And even if a utility chooses to do a single-year rate plan, that still covers that single annual and the reconciliation revenue requirement. I think there's been some talking past each other on this because we are not arguing that there is only one revenue requirement that we're looking at. We're looking at these multiple revenue requirements from the multi-year rate plans, which the legislature knew, again, because it came in through the same legislation that they created, the beneficial electrification plans. And because Ameren and ComEd in the other case, yes, you're on? Oh. Because Ameren and ComEd are only delivery services utilities, the only revenue requirements that they have are delivery services revenue requirements. So when we're looking at the revenue requirements that are to be included here for establishing the cap, it's each annual year within a multi-year rate plan, the reconciliation revenue requirements, and it's all for delivery services. Again, breaking down that categorical distinction, which has existed in the commission's precedent and the court's precedent, is improper and allows the ballooning of the amount of spending that can be in these plans. And in particular, I would note that the commission and the respondents haven't provided an example of another revenue requirement that includes one of these other rates and charges. The several statutory provisions that they point to are another rate or charge that is modeled on a revenue requirement. All they've done is assert that these other kinds of rate and charges have revenue requirements. But there's no cases. There's no commission decisions showing that. Whereas if you looked at the cases that we cited in our brief, the revenue requirement has a very specific meaning in commission proceedings. And while we generally will give deference to the commission in these cases, their deference is improper where they haven't provided anything to back up that position. Unless Your Honor has any questions, I'd like to move to the rebates issue. No, I'm good. Thank you. So again, the rebates and the compliance were now outside of the realm of the second district decisions. These are unique to this case. So the rebates that Ameren has included in its beneficial electrification plan are ones that have been specifically delegated to the Illinois EPA and only to the Illinois EPA. The language in Section 55 says that the Illinois EPA shall issue rebates for Level 2 and Level 3 chargers to public and private organizations. Very clear. It says it shall issue rebates. It doesn't say that it exclusively shall issue rebates. No, Your Honor. But when you have the specific delegation of authority over an action to an agency, that controls over the general delegation of authority to do something similar. And the case in our brief clopal, I think, is pretty on point with regard to this. There, the county board was given the authority to fill elected office vacancies, whereas the county executive was given the general authority to fill vacancies in county offices. And that specific delegation to the county board for elected offices controlled over that general delegation to the executive over offices generally. And that's exactly what we have here. Section 55 gives the EPA specific authority to issue these particular rebates. And the commission does have generalized authority to issue incentives. And a rebate is a kind of incentive. So they have the general authority to issue rebates and to issue incentives, except for this small carve-out portion of the Level 2 and Level 3 chargers installed by public and private organizations. Now, the Illinois EPA chose to only implement that authority that they've been given for publicly accessible charging stations. But they're still the only one granted the authority over Level 2 and Level 3 chargers, whether publicly accessible or not. And one agency cannot take action that has been delegated to another agency, whether or not that other agency has chosen to use its discretion or its authority to take that action. And I just would ask this court to look at the specific language of the rebates that Ameren seeks to include. It's almost word-for-word Level 2 and Level 3 rebates for public and private organizations. And this is exactly the kind of rebate that the commission took out of ComEd's plan because it lacked the authority over these rebates. Those were specifically delegated to the Illinois EPA. And again, they're almost word-for-word exactly the same. The commission hasn't given any reasoned explanation other than it doesn't duplicate or overlap with the existing rebates that the EPA has chosen to implement. And then finally, with the compliance filings, the commission cannot give a utility discretion to set the spending levels and decide how to allocate that spending across its plan through a compliance filing. In particular, I think the language from the Citizens Utility Board case cited in our brief is apt. A compliance, a final order asking for a compliance filing is okay, where it has established constraints which eliminate discretion, leaving the utility only to perform the necessary calculations. And here, instead, what the commission has done, has given Ameren broad discretion to determine how much to spend and how to allocate that across its plan. For instance, with the electric line extensions, it said that Ameren should increase the spending, quote, to the extent the budget allows so that it remains under the cap and cost-beneficial. Now, determining cost-beneficial, whether a plan is cost-beneficial, is a balancing analysis that is entirely up to the commission. That cannot be delegated to the regulated entity. Otherwise, you're, you know, letting the fox into the hen house. The same is true with the pilot programs. It's said to propose a budget for the three pilot programs. And then they could collaborate with commission staff and the other parties to come up with a plan to include in the compliance filing. And the commission was effectively approving these ahead of time. But this is exactly why. They just asked them to provide modifications. How is that approving it ahead of time? So, Your Honor, they said make these changes, and it will be cost-beneficial under the cap and in the public interest as required by Section 45. But the modifications that they've asked them to make were not specific. They said, you know, increase this to the budget allows, make sure that it remains cost-beneficial. They said propose a budget for these pilot programs, and it will be cost-beneficial. But it was still under the rate cap, correct? Yes and no, Your Honor, because we're still talking about this ties back to the first issue with the development of the infrastructure, because only some of the spending is subject to the rate cap. So they told them to increase spending, but only some of the spending that they're telling them to increase was subject to the cap. For instance, the pilot programs under the commission in the second district's reading are not subject to the rate cap. So telling them to propose a budget with spending levels as they saw fit, there is no cap on that. So what has effectively happened here is allowing Ameren, if I might finish, Your Honors, is granting Ameren that discretion to determine what level to set their spending at and what is cost-beneficial, so how it's allocated across the plan. And that is not allowed. Thank you. We'll turn it over to Robert. Good morning again, Your Honors. My name is Robert Weinstock. I'll start with a brief introduction and then get into the rebates issue before my colleague, Mr. Stanton, will cover the retail rate cap, and Ms. Prorok will cover the compliance filing issue. These EV Act amendments that we're here talking about today were part of the Climate and Equitable Jobs Act, which was designed to transform Illinois' economy and environment. This was a big, ambitious statute, and the words give life to big action in the world. One of the main goals was to accelerate the statewide transition to electric vehicles, set a goal of a million EVs on the road by 2030. The AG talks about the spending here, and I think it's important to remember what we are spending for. We are spending for fewer droughts in the state, across our farmland. We are spending for smaller storms, flooding basements all over Illinois. We are spending for less diesel pollution, poisoning kids and school buses on their way to school every day. So when we talk about the spending, we have to talk about the benefit and put that in context. And if you're trying to accelerate electrification, thinking practically, what do you need to do? You need people and you need small businesses to be able to buy EVs themselves, electric vehicles. You need them to be able to get chargers to charge them, and you need infrastructure to connect the grid to those chargers. That's called make-ready infrastructure under the statute. You need those three pieces. That's really complicated. Each of those pieces costs money. There's different manufacturers. There are different changes that happen in those markets. There are also a whole host of local policies and federal policies and a variety of state policies that impact how feasible it is to electrify if you're an individual person or a business. And so what CIG did was it created these beneficial electrification plans so the commission could work through those processes over time, could figure out how all of those overlapping things fit in this giant, complex project the General Assembly set the commission out for. And in doing that, it's really important to think about the structure of these plans. The utility proposes a plan, gets stakeholder input, puts it forward to the commission for approval, and public interest groups like my clients can chime in and approve that plan. Then the commission does not administer these plans at all, contrary to the AG's briefing. They just approve them. Once they're approved as consistent with the statute, the utility goes back and implements them, and then, importantly, has to come back every three years for re-approval from the commission. So the commission can look at what's going on. The commission can ask, What piece is IEPA actually giving? What's going on in the market? Let's adjust the plan to come along. So that's what this is doing here. On the rebates issue in particular, the AG is really grasping at any straw it can to try to cut out the scope and ambition of these plans, and it's doing so and failing to look back at the ambition in the specific words of the text. So I want to start by thanking the AG for conceding that the commission does have authority to approve rebates in general. Their argument is that somehow Section 55 creates an implicit carve-out into that explicit authority that the commission has under Section 45, the provision actually at issue here. I think Your Honor put the question exactly right. Where is the word exclusive? The AG's brief repeatedly italicizes that word and then quotes other words that are actually in the statute. Though the AG might wish that were the structure created, that's not what the AG did. Oh, excuse me, what the General Assembly did. On the now straight-faced way to argue that Section 45 doesn't authorize rebates, they turn to an implicit, trying to import this implicit restriction from 45, or from 55, excuse me. I want to just focus on one thing there. In the cases that the AG cites in their brief, those cases involve an agency trying to assert implicit authority and then the court pointing to another part of the statute that explicitly limits or confers that authority to another entity, right? So this is the opposite situation. This is explicit authority that the agency has, but the AG is suggesting there's an implicit limitation somewhere else. So they're exactly upside down. And the AG's point about the appointed officials language in the one case is really an apt example of the second reason those cases fall apart here, because those are issues like appointments, like enforcement, like permitting, where if you have two agencies with competing authority and you're the regulated entity, it could get very confusing. Counsel, what would be the purpose in limiting rebates to IEPA? What would be the purpose? I have no idea, Your Honor. Because if rebates could only come from IEPA, you would frustrate the General Assembly's purpose in CEJA. And the AG offered a good example of that as well, but he admitted that IEPA has not actually given out these rebates that they said they would. They've given out some, but not all. And so if you're the General Assembly and you want these rebates to happen and you want to spur electrification, you guarantee, you say, IEPA, you do it. And then you say, Commerce Commission, every three years, check in and make sure the utility is providing enough support to complement whatever the IEPA is doing. Why would they want to control rebates? Why would the General Assembly want to control rebates? Right. I don't think they do, Your Honor. I think the General Assembly wants to push rebates, and so therefore they instructed IEPA to do it, and they gave utilities the ability to propose rebates to work around and complement those IEPA rebates, and said to the Commission, you make sure those things actually are complemented, which actually brings us to another part of the statute, Your Honor, which is that both Section 55 and 45 specifically require that type level of coordination. Under Section 55, the IEPA rebates have to be consistent with the DE plans. Under 45, the Commission has to make sure that the DE plans align with those rebates. And then you've got this time in your review, so you can adjust over time as market conditions change, as rebate conditions change. I want to speak very quickly on the ComEd order. It's interesting that the AG is up here asking you to ignore the 2nd District, but to put all this weight on an interim order, one paragraph in an interim order the Commission issued, before it had all the facts in front of it in the ComEd case. That order was never taken through to the final order. No one challenged it in the ComEd final order. It was never considered by a court. That order is wrong. But more importantly, maybe, or more easy for you today, Your Honors, that order is entirely consistent with what the Commission did in AmeriCorps. In both instances, the Commission looked at rebates in a plan, evaluated them against what IEPA was doing, what it knew what IEPA was doing at the time, and it made a case-by-case determination about whether those things were aligned, as the statute requires it to do. If the Commission has to make this alignment decision and they're legally precluded from considering certain rebates, well, then there's no point in saying whether the rebates are aligned and you're reading that section to be a nullity as applied to rebates. I think the other piece on the ComEd order that I would just highlight is they didn't actually go through with the rebates there on these particular Level 2 and Level 3 chargers for these public entities. So it never came up in the final order. I should clarify what I said a moment ago. Just in closing, if I may cite one more part of the statute that the AG has ignored and that I think is pretty key here, and that's back to 45dA2, which lists the components that must be included in the BE Plan. And I quote, BE Plan's, quote, must be designed and reasonably expected to, and then subsection 8, provide resources to support private investment in charging equipment on public and private charging applications. That is precisely what the rebates were never proposed to do here, precisely what the Commission found. Those are the words of the statute. They're the ones actually hitting the wall. Thank you. Thank you, Counsel. Good morning, Your Honors. Again, Tom Stanton, Special Assistant Attorney General on behalf of the Illinois Commerce Commission. That doesn't amplify this record, so I'll speak up. As Mr. Weinstock indicated, I'll address the section 45g's retail rate cap. As part of Ameren's BE Plan order before you, the Commission adopted its retail rate cap. So could I get you to speak? Sure. Retail rate cap holdings and reasoning from the earlier ComEd BE Plan proceeding construing section 45g. The Second District affirmed the Commission's ComEd BE Plan order by opinion on January 13th of this year, and the Attorney General did not seek further review, and the mandate was issued in that case. So the Attorney General presents the same retail rate cap arguments today to this court that the Second District has already rejected and urges you to create a split or a conflict with that district. The court should follow the Second District's well-reasoned decision, reject the Attorney General's arguments, and affirm the Commission's order. Turning to the Attorney General's arguments, I'll first discuss the phrase total annual revenue requirements in section 45g. A revenue requirement is simply the amount of money that a utility must collect from its customers in order to recover the costs of engaging in a particular act or service, and Ameren, like ComEd, is a delivery services company, and it has multiple annual revenue requirements. Staff's expert witness, Kenneth Allen, testified as to Ameren's multiple revenue requirements, and that's Exhibit Volume 2, 1138 and 1139, and Ameren's expert witness, Victoria Kilhoffer, identified Ameren's total annual revenue requirements at Table 1 of both her rebuttal and her surrebuttal testimonies, and that record cites E453, that's the rebuttal, and E653, that's the surrebuttal where she made a correction to one of the calculations in the revenue requirements. And the commission cites to this particular document, it's the Ameren Exhibit 11.0, page 6, at page 29 of its order, so the commission was referring to this particular document. So summing up those multiple annual revenue requirements that are listed in that Table 1, that constitutes Ameren's total annual revenue requirements as required by the plain language of section 45g. And so in this regard, the Attorney General's argument that total annual revenue requirements means only Ameren's single base rate delivery services revenue requirement is simply incorrect. The Attorney General is reading in the limitation to the plain text, a violation of statutory violation principles. And as the court in Comet explained, had the General Assembly intended to refer to that narrower base rate delivery services revenue requirement or even a singular revenue requirement, it could have easily done so. So the Attorney General argues that the commission erred by counting Ameren's revenue requirements that are recovered through riders. But section 45g doesn't give any discussion about what type of proceeding, what form of revenue requirement, or the relation among the different revenue categories, whether any of them should count in the total annual revenue requirements. As the Second District held, the fact that other revenue may be recovered outside of a utilities rate case, that's not evidence that the General Assembly intended for total annual revenue requirements in section 45g of the EVA, should be read as a delivery service revenue requirement. The AG is, again, reading in exceptions and limitations found nowhere in the text. So in sum, the General Assembly meant what it said when it wrote total annual revenue requirements. That's the sum of Ameren's multiple annual revenue requirements that are listed at table 1 at record site EV1-653. And just quickly, the Attorney General argues that the multi-year rate plan establishes more than one revenue requirement. But the multi-year rate plan applies only to the base rate delivery services revenue requirement, and when it refers to each individual year of the four-year rate plan, the statutory language is each annual revenue requirement. And then when it's referring collectively to the four years of the multi-year rate plan, that's when it's referring to revenue requirements collectively. In addition, the multi-year rate plan is optional. The legislature directed both ComEd and Ameren to either file a multi-year rate plan or a general rate case under section 9201 of the Public Utilities Act. And they make that choice every four years. So Ameren chose a multi-year rate plan. In four years, they can go back to just the general traditional rate case and vice versa. And so the Commission's interpretation of total annual revenue requirements as the sum of Ameren's multiple revenue requirements that are listed in that table 1 gives effect to each choice, whereas the Attorney General's proposed reading does not. And counsel for the Attorney General mentioned that in these general 9201 rate cases, there are reconciliations. That's incorrect. In the 9201 proceedings, there is no reconciliation. You're setting rates prospectively. They've been specified over a year, and there's no reconciliation. I'm going to turn quickly to the phrase development of the infrastructure, again, in section 45G. The Attorney General's argument here is that the word development broadens the rate cap to the entire BE plan. But the Attorney General's interpretation rewrites the plain text of section 45G. It leaves out of the text the specific reference to electric vehicle infrastructure. And again, had the General Assembly intended that the rate cap to apply to the entire BE plan, it could have just written that. But it didn't, and we have to respect the legislature's choice. So like the second district, the court should reject the Attorney General's argument that rewrites the plain language from a 1% limit on the development of EV infrastructure to a limit on all BE plan spending. And the Attorney General's interpretation here is fueled by a policy concern, that without a hard statutory rate cap on the entire BE plan, the utility spending will go unchecked. But that concern is unjustified, and it ignores or downplays other checks and balances on BE plan spending, both in the EVA and in the Public Utilities Act. So in addition to the rate cap, section 45 requires BE plans to be cost beneficial and in the public interest. And in performing that cost beneficial analysis, section 45D directs the Commission to consider the impact on customer rates. The Commission is well versed in performing these cost beneficial analyses and evaluating the public interest. And the Commission's primary overarching duty under the Public Utilities Act is to ensure that a utility's rates are just and reasonable, and that would include the BE plan costs at issue here. And finally, contrary to the Attorney General's argument, the Commission did not implicitly deem any Ameren expenditure under the BE plan just and reasonable, when it authorized Ameren to spend up to the budgeted amount. The Commission reviewed Ameren's actual BE plan costs in annual reconciliation proceedings under Ameren's multi-year rate plan to ensure that those actual costs were prudently incurred at a reasonable amount and result in just and reasonable rates. I see, unless the Court has any questions. Hold on. I see no questions. Thank you, Jerome. Thank you, Counsel. Good morning, Your Honors. May it please the Court, my name is Christine Prorock, and I'm here on behalf of Ameren Illinois Company. I'm going to be discussing the third issue in this appeal, which is Ameren Illinois' compliance filing. The Commission's final order directed the company to make certain modifications to its BE plan and to submit a compliance filing that incorporated those modifications. This included adopting additional programming and expanding certain programs to extend to more customers, and this increased the budget for the BE plan. The Commission acted within its authority in ordering these modifications. While the AG hasn't focused on this here today, I want to briefly discuss the delegation of rate-making authority argument that it makes in its opening brief. It argues that the Commission improperly delegated rate-making authority to Ameren Illinois through its compliance filing, and that just can't be the case because the case below was not a rate case. The Commission did not have rate-making authority, and therefore it could not have delegated that authority to Ameren Illinois. There was a separate rate case, as Counsel for the Commission discussed, that decided whether those costs could be recovered from customers. The AG focuses on the specificity of the final order in terms of ordering the modifications to the BE plan, arguing that the company got a blank check, that it had raw discretion to do whatever it wanted, and that's simply not the case. The Commission gave specific directions to the company on which programs it wanted the company to modify and how it wanted the company to modify them. For example, the AG brought up the example of line extension allowances. So the Commission ordered the company to expand line extension allowances that were available through the BE plan, and it did this in a specific way. The Commission adopted ChargePoint's proposal, that was an intervener in the case, that line extension allowances through a particular rider, rider EVCP, be available not only on the utility side of the meter, but on the customer side of the meter as well. Here, the Commission identified a specific proposal in the record that it was adopting, this proposal from ChargePoint, identified which incentives the proposal applied to, line extension allowances through this specific rider EVCP, and how these incentives would be expanded. They could be used on improvements between the customer's meter and the charging station. And I think it's worth noting also that these line extension allowances made up kind of the bulk of the budgetary increase between the CERBO filing, which was prior to the final order, and the compliance filing, and these line extension allowances are subject to the retail rate cap. So there was a cap on spending that applied to these line extension allowances that Ameren had to comply with. The AG hasn't provided any law demonstrating that more was required from the Commission in terms of what it ordered, and it doesn't specify what it believes the Commission should have done differently. And the AG even challenged Ameren Illinois' compliance filing in the proceedings below. It argued that that compliance filing was inconsistent with the final order, and that it was not cost-beneficial. So similar arguments to the arguments that it makes in this appeal. And the Commission considered that motion, and it denied that motion. So, you know, to the extent that there is a concern that this cost-beneficial consideration was delegated to Ameren, the Commission had a chance to look at that compliance filing, and it would have denied the motion had it thought that the compliance filing in the plan was no longer cost-beneficial. And the Commission didn't take issue with the budgetary increases that were reflected in the compliance filing. So the facts of the case simply don't support the AG's claims here. This is not a rate case. The Commission's directives did not constitute a blank check, and the Commission confirmed that the company interpreted its directives in the final order correctly on that motion to reject the compliance filing. For those reasons, and the reasons discussed in our brief, Ameren Illinois Company respectfully requests the Court uphold the Commission's order, unless there are any questions. No questions. Thank you. Thank you. Rebald? Thank you, Your Honor. Quickly, and I'll start with the last points that were raised first. It's not a question of whether or not there was some guidance provided to Ameren in the requested modifications. It's whether that guidance was sufficient enough. And here, it's true that the Commission said increase spending on these specific plans, and that you should increase these particular things in those plans, but it did not say how much. Was it required to? Unless it's going to be allowing the utility to increase it however much the utility wants, then yes, Your Honor. Where does it specify that? I'm sorry, Your Honor? Where does it specify that? Where does the Commission's order specify that? It doesn't. It says increase the spending for the electric line extensions, it says up to the cap. But it also says, and so the plan remains cost-beneficial. So when Ameren is choosing to increase it by X amount, that changes the balance of how the cost-beneficial analysis is done. And if the Commission doesn't know how much that Ameren is going to increase it by, then it can't know how that's going to impact the cost-benefit analysis. And that's true across all of the four major changes that the Commission ordered Ameren to make. The electric line extensions, with the adding EV charger cost-differential spending, and proposing the budget for the three pilots, which under life energy is exactly the kind of thing that the courts have said the Commission does not have the authority to do. And then also removing the limits on participation in several programs. Regarding this not being a rate-setting proceeding, that's true. But when you get to the just and reasonable analysis, where you have the Commission already approving the beneficial electrification plan and all of that spending, that it's cost-beneficial and in the public interest, as long as the utility is doing that spending, it seems unlikely that the Commission is going to, after the fact, say, no, we don't think that's just and reasonable anymore. Regarding the rebates, it's all about authority. The Commission and the Second District here are conflating what an agency is authorized to do and what an agency has chosen to do. And as creatures of statutes, agencies can only do what they have been authorized to do by statute. And here, because I still think that CLOPL is exactly on point, where the board had the authority to fill the elected offices and the executive had the authority to fill offices generally, that specific authority controls over the general authority. Then regarding this being a policy argument, it is a policy argument, but it's a policy that the legislature has explicitly put into the statute in Section 45A. It said, we want to make sure that this increased spending on these necessary electric vehicle, increased use of electric vehicles and the increased impact this is going to have on the grid, we want to make sure that that's balanced against the impacts on rate payers. And then finally, regarding revenue requirements, yes, the Commission and the Commission staff and AMRIN have called these other charges and rates revenue requirements in a document that was provided by AMRIN, but they're not revenue requirements. We don't see any instance in Commission precedent, in court precedent, or in the actual filings regarding these rates and charges that refer to them as revenue requirements, because they're not. The categorically distinct revenue requirements are the general rate case and then the reconciliation proceedings, which are separate proceedings, but there's still an annual revenue requirement that creates the total annual revenue requirements. So unless your honors have any further questions. We do not. Thank you. I will say that only in the midst of time have ever three lawyers divided their time and got done when they were supposed to. But I will note that was because of the prologue. Save some time at the end. You get props for that, it doesn't help your case, but...